TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
CATHY J. OSTILLER (Cal. Bar No. 174582)
Senior Litigation Counsel
KAREN E. ESCALANTE (Cal. Bar No. 304686)
Assistant United States Attorneys
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6159/3358
     Facsimile: (213) 894-6269
     E-mail:   cathy.ostiller@usdoj.gov
               karen.escalante@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                 UNITED STATES DISTRICT COURT

           FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-00474(A)-PSG-9 |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO PRESENTENCE REPORT AND SENTENCING POSITION FOR DEFENDANT RICHARD MARK CIAMPA |
| v. | |
| RICHARD MARK CIAMPA, | Hearing Date:  July 9, 2021 |
| Defendant. | Hearing Time:  9:00 a.m. Location:     Courtroom of the Honorable Philip S. Gutierrez |

     Plaintiff United States of America, by and through its counsel
of record, the Acting United States Attorney for the Central District
of California and Assistant United States Attorneys Cathy J. Ostiller
and Karen E. Escalante, hereby files its response to the Presentence
Report and its sentencing position relating to defendant RICHARD MARK
CIAMPA.

     This response and sentencing position is based upon the attached
///

memorandum of points and authorities, the files and records in this case, the Presentence Report, and such further evidence and argument as the Court may permit.

Dated: June 17, 2021                    Respectfully submitted,

                                        TRACY L. WILKISON
                                        Acting United States Attorney

                                        SCOTT M. GARRINGER
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                              /s/
                                        CATHY J. OSTILLER
                                        KAREN E. ESCALANTE
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES.............................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES............................... 1

I.    INTRODUCTION................................................ 1

II.   STATEMENT OF FACTS.......................................... 1

III.  THE PRESENTENCE REPORT...................................... 7

IV.   CORRECTIONS TO PRESENTENCE REPORT.......................... 10

V.    LOSS CALCULATION........................................... 11

      A.    Starting Point for Defendant's Involvement in the Scheme
            and Exclusion of Pre-March 2009 Claims from Loss
            Calculation........................................ 11

      B.    Exclusion from Loss Calculation of Claims for Services for
            Adults............................................. 12

      C.    Claims for Minor Consent Services.................. 12

      D.    Effect on Interstate Commerce...................... 13

      E.    No Justification for Further Reductions............ 15

VI.   ANALYSIS OF THE SECTION 3553(a) FACTORS.................... 16

      A.    A 109-Month Sentence Is Reasonable Given the Nature and
            Circumstances of the Offense and the History and
            Characteristics of Defendant....................... 18

      B.    A 109-Month Sentence Is Reasonable Because It Reflects the
            Seriousness of the Offense and Satisfies the Goals of 18
            U.S.C. § 3553(a)(2)................................ 21

      C.    A 109-Month Sentence Is Reasonable Because It Does Not
            Create Unwarranted Sentencing Disparities.......... 22

      D.    The Remaining Section 3553(a) Factors Also Support the
            Sentence Requested by the Government............... 23

VII.  CONCLUSION................................................. 24

1

## TABLE OF AUTHORITIES

2

**CASES**

3

Gall v. United States,
     552 U.S. 38 (2007)............................................23

4

United States v. Cantrell,
     433 F.3d 1269 (9th Cir. 2006)...............................17

5

6

United States v. Gelin,
     712 F.3d 612 (1st Cir. 2013)................................14

7

United States v. Knows His Gun,
     438 F.3d 913 (9th Cir. 2006)................................17

8

9

United States v. Nichols,
     464 F.3d 1117 (9th Cir. 2006)...............................17

10

11

United States v. Treadwell,
     990 F.3d 990 (9th Cir. 2010)................................23

12

**STATUTES**

13

18 U.S.C. § 1347.........................................1, 14, 15

14

18 U.S.C. § 24................................................15

15

18 U.S.C. § 3553(a)......................................passim

16

**OTHER AUTHORITIES**

17

U.S.S.G. § 2B1.1.........................................7, 16

18

U.S.S.G. § 2B1.1(a)(2)......................................7

19

U.S.S.G. § 2B1.1(b)(1)(K)...................................7

20

U.S.S.G. § 2B1.1(b)(7)(ii)..................................7

21

U.S.S.G. § 3B1.1.........................................7, 8

22

U.S.S.G. § 3B1.1(a).........................................7

23

U.S.S.G. § 3B1.3.........................................7, 9

24

U.S.S.G. § 3E1.1(a),(b).....................................8

25

U.S.S.G. § 5B1.1...........................................23

26

U.S.S.G. § 5C1.1(f)........................................23

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       On January 6, 2021, defendant RICHARD MARK CIAMPA ("defendant")
4  pled guilty pursuant to a plea agreement to count thirteen of the
5  First Superseding Indictment ("FSI"), which charged defendant with
6  Health Care Fraud in violation of 18 U.S.C. § 1347.  As discussed
7  more fully below, the government agrees with the total offense level
8  and Criminal History Category calculations in the United States
9  Probation Office's Presentence Report ("PSR") (CR 739), but not with
10  the Probation Officer's recommended 120-month term of imprisonment.
11  The government instead recommends a mid-Guidelines range sentence of
12  109 months' imprisonment and otherwise concurs with the Probation
13  Officer's recommended sentence, including a three-year term of
14  supervised release and conditions, payment of a $100 special
15  assessment, and payment of restitution in the amount of $17,640,325.
16  The government also respectfully requests that the Court incorporate
17  the previously entered Preliminary Order of Forfeiture (CR 744) into
18  the Judgment and Commitment Order.

19       As discussed more fully below, a 109-month sentence is both
20  reasonable and appropriate in light of defendant's leadership role in
21  a multi-year fraud scheme against a particularly vulnerable and
22  important government program.  A mid-Guidelines range sentence
23  accounts for the fact that defendant manipulated numerous employees
24  into executing a fraud scheme that ultimately benefited defendant
25  significantly more than anyone else involved in the fraud.

26  ## II.   STATEMENT OF FACTS

27       At the time of entry of his guilty plea, defendant admitted the
28  facts set forth in the factual basis of the plea agreement.  (See CR

684 (Plea Agreement) at 13-18 (¶ 13); PSR ¶¶ 41-58).)  Specifically, defendant admitted that:

In or about 1996, defendant founded Atlantic Recovery Services, later called Atlantic Health Services ("ARS"), a non-profit public benefit corporation located in Long Beach, California, that, among other things, provided substance abuse treatment services to students at high schools and middle schools in the Los Angeles area. Defendant was the President and Chief Executive Officer of ARS.  ARS operated until approximately mid-April 2013.

ARS purported to provide substance abuse treatment services to students through Medi-Cal, a publicly funded health care benefit program, affecting commerce, that provided coverage for medically necessary services to income-eligible individuals in California. Medi-Cal, and its Drug Medi-Cal program, generally receives 50% of its funding from the State of California and 50% of its funding from the Centers for Medicare and Medicaid Services ("CMS"), a federal agency that is a component of the United States Department of Health and Human Services, is located in Baltimore, Maryland, and has a payment center located in Bethesda, Maryland.  Medi-Cal also provides state-funded minor consent services to individuals under the age of 21 who wish to independently and confidentially receive certain health care services, including alcohol and drug counseling, without the consent of their parents.  In determining eligibility for minor consent services, Medi-Cal and/or the relevant county agency excludes parental income and resources from consideration, and minor consent services do not qualify for Federal Financial Participation from CMS. Minor consent services are reimbursed 100% with State General Funds.

1    ARS was certified by the State as a provider, but did not submit

2    billing directly to Drug Medi-Cal.  Rather, ARS contracted with the

3    County of Los Angeles' ("the County") Alcohol and Drug Program

4    Administration (later named the Substance Abuse Prevention and

5    Control) to provide services to students at high schools and middle

6    schools throughout the County.

7    Pursuant to this contractual relationship, ARS submitted claims

8    for reimbursement directly to the County.  The County, in turn,

9    processed the claims, paid ARS for eligible claims, and sought

10   reimbursement from Drug Medi-Cal.  Among other tasks, the County was

11   responsible for determining the Medi-Cal eligibility of students

12   serviced by ARS and staffed the school sites serviced by ARS with

13   County eligibility workers.

14   From March 2009 to mid-April 2013, defendant knowingly and

15   willfully participated in a scheme to defraud Medi-Cal in which

16   (1) ARS billed Medi-Cal's Drug Medi-Cal program through the County

17   for services to students who did not medically need alcohol or drug

18   treatment; (2) ARS billed Drug Medi-Cal through the County for group

19   and individual counseling sessions that were not provided or did not

20   meet the requirements for reimbursement; and (3) ARS employees

21   falsified documentation to support the false claims.

22   In March 2009, Drug Medi-Cal assessed a large overpayment

23   against ARS for Day Care Habilitative ("DCH") claims that ARS

24   previously submitted to Drug Medi-Cal through the County and that

25   Drug Medi-Cal reimbursed erroneously.  Specifically, Drug Medi-Cal

26   determined that minor consent services could not be rendered under

27   the DCH modality, which requires a three-hour counseling session, and

28   made that determination retroactive.  Drug Medi-Cal therefore

3

directed ARS to repay a portion of the amount of the overpayment, and this financial obligation created a significant amount of pressure on defendant.  Defendant, in turn, passed along this financial pressure to his employees and threatened the employees that they would lose their jobs with ARS or have their hours reduced to part-time if they did not generate significant billings.  It was foreseeable to defendant that his threats would and did directly cause ARS employees to engage in fraudulent billing.

From March 2009 to mid-April 2013, defendant knew, or, at a minimum, was aware of a high probability, that, in response to his threats, ARS employees were generating false and fraudulent claims for submission to Drug Medi-Cal through the County, and thus, that Medi-Cal was being defrauded or that money or property owned by or under the custody or control of Medi-Cal was being obtained by means of material false or fraudulent pretenses, representations, or promises.  To the extent that defendant merely was aware of a high probability that ARS employees were engaging in fraud, he deliberately avoided learning the truth, and, therefore, defendant was willfully blind to the fraud that was occurring.  At all times during this period, defendant acted willfully and with the intent to defraud.

Defendant knew or was willfully blind to the fact that the fraud operated in the following ways:

a.   ARS counselors and managers maintained student caseloads by enrolling students in the ARS substance abuse counseling program even if they had used drugs or alcohol only occasionally or even just once;

b.   ARS counselors and managers collected students' signatures on sign-in sheets for counseling sessions, even if the students did not attend the counseling sessions;

c.   ARS counselors and managers recorded times on sign-in sheets, Update Logs, and Progress Notes to make it appear that the students on each sign-in sheet were attending group counseling sessions at different times with no more than ten students at the same time;

d.   ARS counselors and managers prepared Progress Notes and Update Logs that falsely showed that the students in the counselors and managers' caseloads had attended 90-minute group counseling sessions up to five days each week, even though the ARS counselors and managers were not meeting with students every day;

e.   ARS counselors and managers completed paperwork and prepared Progress Notes and Update Logs that falsely showed that the counselors and managers had conducted 60-minute individual counseling sessions with students, including on days when the students in the counselors and managers' caseloads were absent from school or the counselors and managers were absent from work.

f.   ARS counselors and managers were directed to have a one-on-one crisis session with every student twice a month, even though defendant knew that a crisis session was supposed to happen only when a student had a relapse or an "imminent threat" of relapse and could not be planned in advance; and

g.   ARS counselors and managers billed for services conducted at unlicensed sites as if they had occurred at licensed sites to ensure payment from Medi-Cal.

1    Defendant knew or was willfully blind to the fact that ARS would

2    use the false Update Logs to generate claims for Drug Medi-Cal

3    reimbursement for group and individual counseling sessions, and that

4    the Progress Notes and falsified sign-in sheets would be maintained

5    in the students' files as documentation supporting those claims in

6    the event of a Medi-Cal audit.

7    Defendant made statements to ARS employees that encouraged them

8    to engage in fraud.  For example, in addition to the threats

9    described above, defendant (1) told ARS employees that they should

10   "find a way" to enroll more students in ARS' program despite his

11   awareness of Drug Medi-Cal's medical necessity requirements;

12   (2) suggested that ARS' billing should be higher because counselors

13   were physically present at the schools all day despite his awareness

14   of the schools' limitations on counselors' access to students;

15   (3) directed that ARS should bill for services performed at

16   unlicensed sites as if they had taken place at licensed sites;

17   (4) told co-defendant Gregory Hearns and others in ARS' billing

18   department how much defendant wanted ARS to bill Drug Medi-Cal

19   through the County each month; and (5) strongly encouraged counselors

20   to bill more individual crisis sessions on the basis that, given the

21   personal circumstances of the students who attended the schools where

22   ARS operated, the students were always "in crisis," even though

23   defendant knew individual crisis sessions could only be billed when a

24   student relapsed or was facing an imminent threat of a relapse.

25   In furtherance of the scheme, defendant knowingly and willfully

26   caused false and fraudulent claims, which he knew to be material to

27   reimbursement by Medi-Cal, to be submitted to the County by ARS,

28   including, in particular, the following claim:

In or about December 2011, ARS submitted a false and fraudulent claim to the County for Medi-Cal reimbursement (Drug Medi-Cal claim #A702847354), in the amount of $69.59 for an individual counseling session for Soledad Enrichment Action ("SEA") Compton student J.R. allegedly provided by ARS counselor and co-defendant Shyrie Womack on November 23, 2011, a school holiday, when the student was absent and Womack was not present at SEA Compton and did not provide any counseling.

During the period from March 2009 to mid-April 2013, ARS submitted to Drug Medi-Cal through the County claims totaling approximately $18,530,927 for counseling services purportedly provided to students by ARS counselors and managers, and Medi-Cal paid approximately $17,640,325 on those claims.  Of those claims, ARS billed approximately $17,681,056 for minor consent services that were reimbursed by Drug Medi-Cal solely with State General Funds in the approximate amount of $17,539,914.

**III. THE PRESENTENCE REPORT**

In the PSR, the Probation Officer calculated a total offense level of 32 and a Criminal History Category of I.  The Probation Officer's offense level calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Loss of More than $9,500,000 But Not More than $25,000,000: | +20 | [U.S.S.G. § 2B1.1(b)(1)(K)] |
| Federal health care offense involving Government health care program: | +3 | [U.S.S.G. § 2B1.1(b)(7)(ii)] |
| Aggravating Role: | +4 | [U.S.S.G. § 3B1.1(a)] |
| Abuse of Position of Trust/ Use of Special Skill: | +2 | [U.S.S.G. § 3B1.3] |

1   Acceptance of Responsibility:   -3      [U.S.S.G. § 3E1.1(a),(b)]

2   Total Offense Level:          32

3

4 (PSR ¶¶ 66-95.)

5     The parties agreed in the plea agreement that a four-level

6 aggravating role enhancement is appropriate, and the Probation

7 Officer concurred.  (CR 684 at 19 (¶ 15); PSR ¶ 86.)  The factors set

8 forth in the Sentencing Guidelines Manual support that enhancement.

9 See U.S.S.G. § 3B1.1 cmt. n.4 (factors to consider include "the

10 exercise of decision making authority, the nature of participation in

11 the commission of the offense, the recruitment of accomplices, the

12 claimed right to a larger share of the fruits of the crime, the

13 degree of participation in planning or organizing the offense, the

14 nature and scope of the illegal activity, and the degree of control

15 and authority exercised over others").  Specifically, defendant was

16 the head of the fraudulent enterprise at ARS that involved numerous

17 individuals manipulated by defendant and acting in accordance with

18 defendant's instructions to increase billing in order to save their

19 jobs.  (PSR ¶ 86.)  In addition, as noted below, defendant benefited

20 the most from the increased billing.

21     The parties also agreed that an abuse of position of trust

22 enhancement was appropriate, and the Probation Officer again

23 concurred.  (CR 684 at 19 (¶ 15); PSR ¶ 89.)  Defendant was the

24 President and Chief Executive Officer of ARS, as well as the enrolled

25 provider with Medi-Cal (reflected in the discovery produced to

26 defendant in this case).  (See PSR ¶ 89.)  As the head of the company

27 and the enrolled provider, defendant was ultimately responsible for

28 the billing submitted to Medi-Cal, and Medi-Cal relied on defendant

1  to ensure ARS was submitting true and accurate claims to Medi-Cal.

2  (PSR ¶¶ 88-89.)  Accordingly, defendant's position at ARS was

3  "characterized by professional or managerial discretion" and

4  "contributed in some significant way to facilitating the commission

5  or concealment of the offense," thereby justifying the two-level

6  enhancement for abuse of position of trust.  U.S.S.G. § 3B1.3 cmt.

7  n.1.

8       Based on defendant's lack of any prior convictions, the

9  Probation Officer also determined that defendant has zero criminal

10  history points and thus falls within Criminal History Category I.

11  (PSR ¶¶ 100-01.)  The Probation Officer recognized that a total

12  offense level of 32 and a Criminal History Category of I result in an

13  advisory Guidelines range of 121-151 months.  (PSR ¶ 163.)  However,

14  the Probation Officer also recognized that the statutorily authorized

15  maximum sentence for the count of conviction is ten years, and,

16  therefore, the advisory Guidelines term of imprisonment is 120

17  months.  (PSR ¶¶ 162-63.)

18       In the letter accompanying the PSR ("Rec. Letter") (CR 738), the

19  Probation Officer recommended that the Court impose a sentence of 120

20  months' imprisonment for defendant.  (Rec. Letter at 2, 5.)  The

21  Probation Officer also recommended a three-year term of supervised

22  release and conditions, payment of a $100 special assessment, and

23  payment of restitution in the amount of $17,640,325.  (Rec. Letter at

24  1-3.)

25       As noted in the PSR, the parties agreed in the plea agreement to

26  recommend a two-level downward variance "because the justice system

27  is facing un unprecedented crisis through the backlog of cases and as

28  a recognition of [defendant's] early acceptance of responsibility."

9

(PSR ¶ 178; see also CR 684 at 19-20 (¶ 17).)  With a two-level

downward variance, the total offense level becomes 30.  When combined

with a Criminal History Category of I, the resulting Sentencing

Guidelines range is 97-121 months.  The Probation Officer's

recommended sentence of 120 months is at the higher end of that

Guidelines range.  However, as discussed more fully below, the

government instead recommends a mid-Guidelines range sentence of 109

months' imprisonment.

On June 14, 2021, the Court entered a Preliminary Order of

Forfeiture (CR 744) pertaining to four properties described in the

FSI.  The Preliminary Order of Forfeiture also provides that:

> Pursuant to Fed. R. Crim. P. 32.2(b)(4), this Preliminary
> Order of Forfeiture shall become final as to defendant at
> the time of defendant's sentencing and shall be made part
> of defendant's sentence and included in defendant's
> judgment.

(CR 744 at 6.)

## IV.  CORRECTIONS TO PRESENTENCE REPORT

The government has identified three errors in the PSR that

should be corrected:

1.   The original case to which this case and all of the other

related cases are related is not identified in the PSR.  That case is

United States v. Cindy Leticia Ortiz, CR 13-00485-PSG.

2.   The related case identified as "Sentencing pending" in

paragraph 36 of the PSR, United States v. Erin Hoover, CR 14-00240-

PSG, actually has been dismissed as a result of defendant Hoover's

death.  (PSR ¶ 36; United States v. Hoover, CR 14-00240-PSG, Dkt.

79.)

3.   Paragraph 75(a) of the PSR erroneously states that

defendant's "company, ARS, submitted fraudulent claims, which

1  included fraudulent claims for minor consent services, to an

2  insurance company and committed health care fraud." (PSR ¶ 75(a).)

3  In fact, ARS submitted fraudulent claims to the Drug Medi-Cal

4  program, not an insurance company.

5  **V.   LOSS CALCULATION**

6       The FSI alleges that defendant participated in a health care

7  fraud scheme from April 2003 to mid-April 2013, and that ARS billed

8  Medi-Cal approximately $50,822,318 for counseling services and

9  received payments of approximately $46,970,519 during this time.

10  (FSI ¶¶ 23, 26.)  In the factual basis of the plea agreement,

11  however, the government agreed that the starting date of defendant's

12  involvement in the scheme was actually March 2009 and that the loss

13  amounts are $18,530,927 (billed – intended) and $17,640,325 (paid –

14  actual).  (CR 684 at 18 (¶ 13); see also id. at 10-11 (¶ 9), 19

15  (¶ 15).)  The reasons for these revisions are explained more fully

16  below.  While defendant agrees with the March 2009 starting point,

17  defendant does not agree with the government's calculation of the

18  loss amounts.  Rather, as set forth in the plea agreement, defendant

19  believes that the operative loss amount should actually be $84,000

20  (CR 684 at 10-11 (¶ 9), 19 (¶ 15)), and has suggested to the

21  Probation Officer that the amount should be even lower.  (PSR ¶ 61.)

22  As discussed below, however, there is simply no basis to reduce the

23  loss amount in this manner.

24       **A.   Starting Point for Defendant's Involvement in the Scheme**
25          **and Exclusion of Pre-March 2009 Claims from Loss**
           **Calculation**

26       In March 2009, Drug Medi-Cal assessed a large overpayment

27  against ARS based on a change to Drug Medi-Cal's reimbursement

28  procedures for certain types of services.  (PSR ¶ 51.)  As a result,

2009 was a turning point in the way in which ARS operated and created financial pressures for defendant that he, in turn, passed down to his employees.  (See PSR ¶¶ 51-52.)  Defendant has admitted that he threatened ARS employees that they would lose their jobs or have their hours reduced if they did not generate significant billings. (PSR ¶ 52.)  Defendant has further admitted that it was foreseeable to him that his threats would and did directly cause ARS employees to engage in fraudulent billing, and that he acted willfully and with the intent to defraud from March 2009 to mid-April 2013.  (PSR ¶¶ 52-53.)  Because these financial pressures generated defendant's intent to defraud (see PSR ¶ 53), the government believes that March 2009 is the appropriate date to use as the starting point for defendant's involvement in the scheme.  Accordingly, the government agreed to exclude all claims with dates of service prior to March 2009 from the loss calculation.

### B.   Exclusion from Loss Calculation of Claims for Services for Adults

Certain claims in the ARS claims data were for adult clients (defined as individuals over the age of 18 as of the date of service or during the service year).  However, the FSI alleges a scheme involving services for high school and middle school students, not adults.  Therefore, the government agreed to exclude claims for adult clients (based on their date of birth) from the loss calculation. The government also agreed to exclude claims for clients for which no date of birth was identified in the claims data.

### C.   Claims for Minor Consent Services

ARS billed many of the claims in the ARS claims data (and all of the claims that are referenced in the counts of the FSI) to Drug

Medi-Cal under a "minor consent" aid code.[1]  "Minor consent" means that the students were able to consent to the counseling services without having to tell their parents or obtain parental consent, and the parents' financial circumstances were not taken into account by Medi-Cal when determining whether the students were eligible for the services.  (PSR ¶ 47.)  Claims for "minor consent" services are reimbursed exclusively with funds from the State of California.  (PSR ¶ 48.)  Defendant believes that, as a result, claims for minor consent services should not be included in the loss calculation.  (See PSR ¶ 60(a).)  The government disagrees (as does the Probation Officer (PSR ¶¶ 63, 75-77)).  That funds from the State of California were used to pay these fraudulent Medi-Cal claims does not provide a basis to exclude these claims from the loss calculation.  In this respect, it is no different than a health care fraud case based on fraudulent claims submitted to private insurance companies; those private insurance companies are still the victims, and the amounts of the fraudulent claims billed to them are included in the loss calculation.

### D.   Effect on Interstate Commerce

Related to the minor consent issue, defendant has asserted that the claims for minor consent services referenced in the counts of the FSI somehow deprive the Court of jurisdiction over this case because there was no effect on interstate commerce.  (See PSR ¶ 60(a)(i).)  However, this argument fails.

---

[1] An aid code identifies the type of service for which a Medi-Cal claim is submitted.  For example, the aid codes for minor consent services that appear in the ARS claims data are 7M, 7N, and 7P.

1    First, the effect on interstate commerce only needs to be de

2  minimis.  See United States v. Gelin, 712 F.3d 612, 620 (1st Cir.

3  2013).

4    Second, not all of ARS' claims during the relevant period were

5  for minor consent services, and thus, at least some of ARS' claims

6  were reimbursed with federal funds as well as state funds.  This is

7  evident from the last paragraph of the factual basis in the plea

8  agreement, which identifies the total billed and paid amounts during

9  the relevant period and then the smaller (although still significant)

10  total billed and paid amounts for minor consent services during the

11  relevant period.  (CR 684 at 18 (¶ 13); see also PSR ¶ 58.)

12    Third, the relevant issue is not whether ARS' claims were paid

13  with federal funds but rather whether the health care benefit program

14  that paid the claims – Medi-Cal – operates in interstate commerce.

15  Specifically, the health care fraud statute charged in the FSI, 18

16  U.S.C. § 1347, does not, by its terms, require an effect on

17  interstate commerce.  Rather, it refers to, among other things:

18         a scheme . . . (1) to defraud any health care benefit
           program; or (2) to obtain, by means of false or fraudulent
19         pretenses, representations, or promises, any of the money
           or property owned by, or under the custody or control of,
20         any health care benefit program, in connection with the
           delivery of or payment for health care benefits, items, or
21         services[.]

22  18 U.S.C. § 1347(a) (emphasis added).  "Health care benefit program,"

23  in turn, is defined in 18 U.S.C. § 24 as:

24         any public or private plan or contract, affecting commerce,
           under which any medical benefit, item, or service is
25         provided to any individual, and includes any individual or
           entity who is providing a medical benefit, item, or service
26         for which payment may be made under the plan or contract.

27  18 U.S.C. § 24(b) (emphasis added).  Because a health care benefit

28  program includes both public and private plans, Section 1347 does not

apply only to federal health insurance plans.  It can also apply to private health insurance plans, as long as there is an effect on interstate commerce.  However, Medi-Cal is a joint federal and state health insurance program because it generally receives 50% of its funds from the federal government and 50% of its funds from the State of California.  (PSR ¶ 46.)  Moreover, the "affecting commerce" component of Section 24(b) is satisfied as to Medi-Cal because 50% of Medi-Cal's funding comes from the Centers for Medicare and Medicaid Services ("CMS"), a federal agency that is a component of the United States Department of Health and Human Services, is located in Baltimore, Maryland, and has a payment center located in Bethesda, Maryland.  (See id.)

Even though none of the counts in the FSI was based on a claim reimbursed with federal funds, and even if the government could not demonstrate any effect on interstate commerce related to the State of California's payment of these claims, it would not matter because defendant still participated in a scheme to defraud Medi-Cal, a health care benefit program that operates in interstate commerce.

### E.   No Justification for Further Reductions

Defendant has taken the position that further reductions should be made as a result of incorrect client dates of birth or missing or incorrect aid codes in the claims data.  (See PSR ¶ 60(b), (c), (d), (e).)  There is no basis for these further reductions.

In particular, the Guidelines define "Intended Loss" as "(I) . . . the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur."  U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).  Here, where ARS billed these claims, ARS (and, by extension,

15

1   defendant) intended to get paid for them.  Even if there were errors

2   in the aid codes or the dates of birth, even if those errors were

3   attributable to Medi-Cal eligibility workers rather than ARS

4   employees, and even if those errors resulted in the claims being

5   denied, those claims should be counted towards the total intended

6   loss because, by submitting the claims, ARS intended to get paid on

7   those claims notwithstanding any errors.

8          There is no basis to conclude that the amounts associated with

9   those claims should be excluded from the intended loss calculation,

10  and thus, excluding these claims and amounts would give defendant an

11  undeserved windfall.  This is particularly the case here, where over

12  $1.4 million in billed claims that the government excluded because

13  the client was over 18 as of the date of service or during the

14  service year, or because no date of birth was provided, were actually

15  for minor consent services.  As noted above, the government agreed to

16  exclude adult claims because the FSI alleges a scheme involving

17  services for high school and middle school students, not adults.

18  Given that ARS billed these claims as minor consent claims, however,

19  the claims almost certainly were for students on whose behalf ARS

20  billed as part of the scheme alleged in the FSI and did not need to

21  be excluded.  Therefore, the government believes that any further

22  exclusions and reductions are unwarranted and, accordingly, that the

23  loss amounts set forth in the factual basis of the plea agreement and

24  the PSR – $18,530,927 (billed – intended) and $17,640,325 (paid –

25  actual) – are correct.

26  **VI.   ANALYSIS OF THE SECTION 3553(a) FACTORS**

27         Based on a total offense level of 32 and a Criminal History

28  Category of I, the applicable Guidelines sentencing range in this

16

case is 121-151 months.  However, with a two-level downward variance, the total offense level becomes 30, which, when combined with a Criminal History Category of I, results in an applicable Sentencing Guidelines range of 97-121 months.  While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in 18 U.S.C. § 3553(a).  See United States v. Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006).  "To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a).  This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence."  United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006)).

The Section 3553(a) factors are as follows:

1) The nature and circumstances of the offense and the history and characteristics of the defendant;

2) The need for the sentence imposed –

   (A)  To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)  To afford adequate deterrence to criminal conduct;

   (C)  To protect the public from further crimes of the defendant; and

   (D)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3) The kinds of sentences available;

4) The kinds of sentence and the sentencing range established for the offense and the defendant as set forth in the Sentencing Guidelines;

5) Any pertinent policy statement issued by the Sentencing Commission;

6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7) The need to provide restitution to any victims of the offense.

See 18 U.S.C. § 3553(a).  The government believes that the factors set forth in 18 U.S.C. § 3553(a) would be satisfied by a 109-month sentence and that such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.  18 U.S.C. § 3553(a).

### A. A 109-Month Sentence Is Reasonable Given the Nature and Circumstances of the Offense and the History and Characteristics of Defendant

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of defendant.  These factors warrant a two-level downward variance and a mid-Guidelines range sentence of 109 months' imprisonment in this case.

Defendant was involved in a four-year health care fraud scheme that involved billing Medi-Cal millions of dollars for substance abuse counseling services that were not medically necessary, were not provided, or were not provided in accordance with Medi-Cal regulations and that were supported by false documentation.[2]

---

[2] The government has not conceded that no fraud occurred at ARS prior to March 2009 but recognizes that the impetus for the fraud of which defendant was aware (or at least as to which he was willfully

*(footnote cont'd on next page)*

1   Defendant was the founder and President and Chief Executive Officer

2   of ARS, a company that employed dozens of counselors and offered

3   substance abuse counseling services at over fifty Los Angeles County

4   schools.  (See PSR ¶¶ 41-43, 49.)  Following Medi-Cal's imposition of

5   a large overpayment on ARS in March 2009, defendant began to feel

6   financial pressure, which he passed along to his employees by

7   threatening that their jobs would be at risk if they did not increase

8   their Medi-Cal billing.  (PSR ¶¶ 51-52.)  It was reasonably

9   foreseeable to defendant that these threats would cause his

10  employees, many of whom had suffered from their own substance abuse

11  issues in the past and had criminal history, to engage in fraudulent

12  billing in order to keep their jobs.  (See PSR ¶ 52.)  Defendant knew

13  or was willfully blind to the fact that the fraud was taking place in

14  the various forms described in the factual basis of the plea

15  agreement (e.g., billing for services that were not medically

16  necessary, not provided, not provided in compliance with Medi-Cal

17  regulations, and/or conducted at unlicensed sites).  (CR 684 at 14-17

18  (¶ 13); see also PSR ¶¶ 53-56.)

19      In addition, as the money laundering allegations in the FSI (FSI

20  ¶¶ 31-33) reflect, and as the discovery produced to defendant in this

21  case demonstrates, defendant (1) controlled the bank accounts for

22  ARS; (2) stood to gain the most from the fraud; (3) did, in fact,

23  profit more from the fraud than any of the ARS counselors or

24

25  blind) took place after the March 2009 overpayment generated
    significant stress for defendant.  Given that defendant caused others
26  to commit fraud, and to avoid sentencing disparities with other ARS
    defendants who have pled guilty and any co-defendants who are
27  convicted at trial, the government intends to recommend adjustments
    to the loss calculations for all of the other ARS defendants to
28  reflect the same operative time period for the fraud scheme (i.e.,
    March 2009 to mid-April 2013).

supervisory counselors, many of whom were hourly wage earners; and (4) was able to use the money earned from the fraud to pay for personal expenses, such as mortgage payments on real property he owned and a down payment on new real property he purchased.

Although defendant has no criminal history, he does have a significant number of prior arrests.  And, while nearly all of defendant's arrests are for non-violent offenses and are over twenty years old, his most recent arrest occurred after defendant was indicted in this case and was for domestic violence against his estranged wife.  (PSR ¶¶ 104-12.)  While defendant's lack of criminal history is mitigating, this factor has been taken into account in the Guidelines calculation.

As noted in the plea agreement and the PSR, the government recommends a two-level downward variance for defendant.  A two-level downward variance is appropriate in this instance to recognize defendant's "early acceptance of responsibility" during the COVID-19 pandemic because "the justice system is facing an unprecedented crisis through the backlog of cases" resulting from the pandemic and defendant's willingness to appear by video teleconference and waive his appellate rights will "lessen the burden on the court system." (CR 684 at 19-20 (¶ 17); see also PSR ¶ 178.)

The government believes that a mid-Guidelines range sentence, rather than a high-end sentence as recommended by the Probation Officer, is appropriate for defendant given the history and characteristics of defendant and the nature of the allegations in this case.  Calculating the sentence at the mid-point of the range acknowledges that defendant was the head of the fraudulent operation and benefited the most from the fraud committed by the counselors,

the supervisory counselors, and co-defendant Gregory Hearns (who submitted ARS' billing to Medi-Cal).  While these facts are taken into account by the four-level aggravating role enhancement, the government maintains they also should be factored in when determining the appropriate point in the range at which to sentence defendant. (See Rec. Letter at 5 (finding high-end sentence "is sufficient to reflect the seriousness of the offense, and it satisfies the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").)  The Probation Officer's concern regarding sentencing disparities will be addressed in part by the government's loss calculation adjustments for the other ARS defendants (see supra n.2), but a mid-Guidelines range sentence for defendant helps distinguish defendant from the other ARS defendants and reflects a careful balancing of the aggravating and mitigating facts related to his conduct. Accordingly, the government respectfully requests that the Court impose a 109-month term of imprisonment.

**B.  A 109-Month Sentence Is Reasonable Because It Reflects the Seriousness of the Offense and Satisfies the Goals of 18 U.S.C. § 3553(a)(2)**

In accordance with 18 U.S.C. § 3553(a)(2), the Court is to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of defendant, and to provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  The government respectfully submits that a 109-month sentence (1) will appropriately reflect the seriousness of the

offense and promote respect for the law; (2) will deter future criminal conduct from both the defendant and others without being greater punishment than necessary; and (3) will serve to protect the community.

As described above, defendant manipulated ARS employees into committing health care fraud that ultimately benefited defendant.  By requiring defendant to spend 109 months in custody, the Court will impress upon defendant the seriousness of his crime of health care fraud, give defendant time to reconsider his actions in light of the consequences, and protect the community.

More importantly, a 109-month sentence is necessary to deter others from committing health care fraud in the future.  Health care fraud is endemic in the nation and in this District in particular, as the dockets of courts in this District make clear.  The prospect of a significant sentence for participation in such schemes is the strongest weapon the government has in fighting rampant fraud.

In light of these considerations, a mid-Guidelines range sentence of 109 months' imprisonment is appropriate.

**C.   A 109-Month Sentence Is Reasonable Because It Does Not Create Unwarranted Sentencing Disparities**

Pursuant to 18 U.S.C. § 3553(a)(6), the Court is required to minimize sentencing disparity among similarly situated defendants. One way of doing so is to correctly calculate the Guidelines range. See United States v. Treadwell, 990 F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity' . . . ."); see also Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Sentencing Guidelines ranges.  Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.").  Here, the Probation Officer has correctly calculated the Guidelines range (including a variance that the government also supports), and both the Probation Officer's recommended sentence of 120 months and the government's recommended sentence of 109 months are within that range.  Accordingly, a 109-month sentence for defendant is both appropriate and consistent with sentences of other similarly situated defendants.  Moreover, as noted above, the government intends to recommend adjustments to the loss calculations of the other ARS defendants to avoid any sentencing disparities.

### D. The Remaining Section 3553(a) Factors Also Support the Sentence Requested by the Government

Section 3553(a)(3) requires the Court to consider the kinds of sentences available.  Given the nature of defendant's offense, any sentence that does not involve some period in custody would not be appropriate here.  In addition, defendant's crime falls within Zone D of the Sentencing Table, and non-custodial sentences are discouraged for such offenses.  See U.S.S.G. § 5C1.1(f); U.S.S.G. § 5B1.1 cmt. n.2.  (PSR ¶ 168.)  Furthermore, the public interest in satisfying the other Section 3553(a) factors of obtaining a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from further crimes of defendant outweighs any interest in having defendant avoid time in custody.

Sections 3553(a)(4) and (5) require the Court to treat the Guidelines as merely "advisory" but to take them into consideration nonetheless, as the government has done herein and as the Probation Officer did in the PSR.

Finally, under 18 U.S.C. § 3553(a)(7), the Court is required to consider the need to provide restitution to the victims of the offense.  As noted above, the Probation Officer has calculated a restitution amount for this case, and the government agrees that this amount is correct and respectfully requests that that the Court order defendant to pay $17,640,325 in restitution.

**VII. CONCLUSION**

For the foregoing reasons, the government concurs with the PSR and respectfully submits that the factors set forth in 18 U.S.C. § 3553(a) support the imposition of a sentence that includes a 109-month term of imprisonment, a three-year period of supervised release and conditions, payment of a $100 special assessment, payment of restitution in the amount of $17,640,325, and forfeiture in accordance with the Preliminary Order of Forfeiture previously entered in this case (CR 744).

## CERTIFICATE OF SERVICE

I, **Teresa Hierro-Terrell**, declare:

That I am a citizen of the United States and a resident of or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of 18; and that I am not a party to the above-titled action;

That I am employed by the United States Attorney for the Central District of California, who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

**GOVERNMENT'S RESPONSE TO PRESENTENCE REPORT AND SENTENCING POSITION FOR DEFENDANT RICHARD MARK CIAMPA**

☐ Placed in a closed envelope for collection and inter-office delivery, addressed as follows:

☐ Placed in a sealed envelope for collection and mailing via United States mail, addressed as follows:

☐ By hand delivery, addressed as follows:

☐ By facsimile, as follows:

☒ Via email, as follows:

☐ By Federal Express, as follows:

Maytee_Zendejas@cacp.uscourts.gov

This Certificate is executed on **June 17, 2021**, at Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

*Teresa Hierro-Terrell*

Teresa Hierro-Terrell
Legal Assistant